UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SCOTT LUDOVISSY and ANN GORDON TRAMMELL, Derivatively on Behalf of BELLICUM PHARMACEUTICALS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD A. FAIR, THOMAS J. FARRELL, ALAN A. MUSSO, ANNEMARIE MOSELEY, JAMES F. BROWN, JAMES M. DALY, STEPHEN R. DAVIS, REID M. HUBER, JON P. STONEHOUSE, FRANK B. MCGUYER, and KEVIN M. SLAWIN, <br><br> Defendants, <br><br> and <br><br> BELLICUM PHARMACEUTICALS, INC., a Delaware corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br><br><br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT, AND INSIDER SELLING** <br><br><br><br> <u>JURY DEMAND</u> |

Plaintiffs Scott Ludovissy and Ann Gordon Trammell ("Plaintiffs"), by their attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Federal Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Insider Selling derivatively for the benefit of Nominal Defendant Bellicum Pharmaceuticals, Inc. ("Bellicum" or the "Company"). Plaintiffs base their allegations on personal knowledge and, as to all other matters outside his personal knowledge, upon information and belief based on the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings in the related securities fraud class action, *Kakkar v. Bellicum Pharm., Inc.*, No. 4:18-cv-00338 (S.D. Tex.) filed February 26, 2018 (the "Securities Class Action") (Amended Complaint filed May 15, 2019); and (iii) review of press releases, news reports, analyst reports, industry reports, investor conference call transcripts, and other information available in the public domain.

## I.      INTRODUCTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of Bellicum against certain of its current and former officers and directors seeking to remedy their violations of the federal securities laws, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and insider selling. Defendants' actions have caused substantial financial and reputational harm to Bellicum.

2.      Bellicum is a clinical-stage biopharmaceutical company which has never been profitable since it does not have any products approved for commercial sale. For this reason, it finances its operations through grants and the issuance of debt or equity.

3.    Bellicum's lead product candidate, BPX-501, is a T-cell therapy used in connection with transplants of stem cells from bone marrow and blood and is administered after allogeneic hematopoietic stem cell transplantation ("HSCT").

4.    Allogeneic HSCT involves transferring blood-forming stem cells from a healthy genetically similar donor to the patient. When a transplant is successful, the donor stem cells will replace stem cells in the patient's bone marrow. The donated cells will then produce white blood cells that attack any remaining cancer cells in the patient's body. Because allogeneic HSCT transplants are known to be curative, they are the standard of care for many cancers and genetic blood diseases.

5.    The challenge for most potential allogeneic HSCT patients is finding the perfect match. For these patients, physicians may consider a haploidentical transplant, *e.g.*, from a sibling, parent, or child. Although haploidentical donors are relatively easy to find, morbidity or mortality associated with graft-versus-host disease (GvHD)[1] and infections are significant concerns. Therefore, haploidentical HSCT transplants are usually performed only after all other options are exhausted. Mitigation of the risk of GvHD in haploidentical transplants typically involves depletion of T-cells from the donor, which may then lead to infections or other serious challenges with the patient, like non-engraftment, slow immune reconstitution, or relapse.

6.    Bellicum's BPX-501 product is designed to address physicians' reluctance to perform these riskier transplants. The product contains a "safety switch" which allows important T-cells to be added back, to speed immune reconstitution and control infections. Alpha beta T-cells are removed from the Graft and, in a separate collection of donor T-cells, a molecular safety

---

[1] GvHD is a complication that occurs in a patient after transplant when immune cells from the donor (that is, the "Graft") attack the patient's own tissues. Symptoms can range from mild to life-threatening, and often include skin inflammation, jaundice, or GI discomfort.

switch is introduced. The safety switch consists of molecular switches (*i.e.*, modified forms of signaling proteins) which are triggered inside the patient by infusion of small molecule rimiducid. The BPX-501 product is then typically infused into the patient within 7-14 days after the transplant. Should severe GvHD occur, the administration of rimiducid will activate the safety switch to ablate the gene-modified donor T-cells and quickly resolve the GvHD. Thus, BPX-501's potential benefits include improving the chances of transplant success, accelerating the recovery of the depleted immune system, and decreasing infection and relapse rates.

7.    Bellicum began Phase 1/2 clinical trials of BPX-501 in 2014. However, the clinical trial practices, procedures, and protocols that it had in place to monitor, manage, and report adverse events suffered from egregious deficiencies. Specifically, Bellicum did not have appropriate clinical trial practices, procedures, and protocols in place for comprehensive monitoring and management of neurologic adverse events, which are known risks in patients undergoing allogeneic HSCT. With the Company's materially deficient clinical trial practices, procedures, and protocols came significant regulatory risk since other T-cell therapy candidates had already attracted increased attention from the United States Food and Drug Administration ("FDA") following deaths in clinical trials. For example, patient deaths resulted in FDA-mandated clinical holds in 2016 and 2017 on trials being conducted by Juno Therapeutics, Inc. and Cellectis SA, respectively.

8.    Moreover, during Bellicum's Phase 1/2 clinical trial referred to as BP-004, which took place in both European and United States transplant centers, three patients treated with BPX-501 suffered from encephalopathy. Encephalopathy is a term that generally refers to brain disease, damage, or malfunction. One of those patients died. Yet, the Individual Defendants failed to timely

disclose, or cause Bellicum to disclose, this material information which was necessary to make the Company's statements concerning BPX-501 not misleading.

9.      As set forth herein, the Individual Defendants[2] violated the federal securities laws, breached their fiduciary duties to Bellicum and its shareholders, wasted corporate assets, and were unjustly enriched by causing the Company to release materially false and misleading statements to the public regarding BPX-501 during 2015, 2016, and 2017. For instance, in repeatedly opting to speak about Bellicum's pursuit of regulatory approval for BPX-501 by means of its clinical trials, the Individual Defendants failed to explain, or cause to be explained, that the Company's clinical program suffered severe flaws in monitoring and managing adverse events that could ultimately lead the FDA or other regulators to delay or altogether prevent completion of clinical testing or the approval of BPX-501. Because BPX-501 was far and away Bellicum's leading product candidate, such undisclosed regulatory risk threatened the Company's overall financial viability. The Individual Defendants further breached their fiduciary duties by failing to timely remedy, or otherwise cause to be addressed, these deficient clinical trial practices. They also failed to cause the timely disclosure of three cases of encephalopathy which were deemed possibly related to BPX-501.  Certain defendants also violated the law by engaging in insider selling.

10.      Although the Individual Defendants' concealment of these clinical trial deficiencies was successful in the short term, the deception soon caught up with the Company. On January 30, 2018, Bellicum issued a press release entitled "Bellicum Pharmaceuticals Announces Clinical Hold on BPX-501 Clinical Trials in the United States," announcing that it had "received notice from the [FDA] that U.S. studies of BPX-501 have been placed on a clinical hold following three

---

[2] The "Individual Defendants" are defendants Richard A. Fair, Thomas J. Farrell, Alan A. Musso, Annemarie Moseley, James F. Brown, James M. Daly, Stephen R. Davis, Reid M. Huber, Jon P. Stonehouse, Frank B. McGuyer, and Kevin M. Slawin.

cases of encephalopathy deemed as possibly related to BPX-501." This was the first time that the Company publicly acknowledged the serious adverse events that were associated with the BPX-501 clinical trials.

11.     On this news, Bellicum's stock price plummeted $2.12 per share—over 25%—to close at $6.08 per share on January 31, 2018, erasing more than ***$70 million*** in market capitalization overnight.

12.     As a direct result of this unlawful course of conduct, the Company is now the subject of the Securities Class Action. The Securities Class Action asserts claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against Bellicum and the Securities Class Action Defendants (defined below at ¶ 25) in connection with the Company's improper and misleading statements concerning BPX-501.

13.     Due to Bellicum's Board of Directors' (the "Board") direct involvement in the wrongdoing, the substantial likelihood of liability its members face, and its members' lack of independence, any demand upon the Board to rectify the wrongdoing described herein would be a wasteful and useless act. Accordingly, Plaintiffs bring this action against the Individual Defendants to repair the harm that they caused Bellicum by their faithless actions.

## II.     JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, this Court has jurisdiction over the contribution claims asserted herein under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over each defendant because each defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because (i) Bellicum maintains its principal place of business in this District; (ii) one or more of the defendants resides or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   PARTIES

### A.   Plaintiffs

17.     Plaintiff Scott Ludovissy is a current stockholder of Bellicum and has continuously owned such shares since January 2015.

18.     Plaintiff Ann Gordon Trammell is a current stockholder of Bellicum and has continuously owned such shares since November 2013.

19.     Plaintiffs will hold Bellicum shares continuously throughout the pendency of this action. Plaintiffs bring this action derivatively in the right of and for the benefit of Bellicum. Plaintiffs will fairly and adequately represent the interests of Bellicum and its stockholders in enforcing the rights of the Company.

### B.   Nominal Defendant

20.     Nominal Defendant Bellicum is a clinical-stage biopharmaceutical company focused on discovering and developing novel cellular immunotherapies by controlling T-cell

function via molecular switches. It is a Delaware corporation with principal executive offices located at 2130 West Holcombe Boulevard, Suite 800, Houston, Texas 77030. Bellicum reportedly had 173 full-time employees as of December 31, 2018. The Company's shares trade on the NASDAQ under the ticker symbol "BLCM."

### C.     Individual Defendants

21.     Defendant Richard A. Fair ("Fair") has served as the Company's President and Chief Executive Officer ("CEO") and a member of its Board since January 2017. Fair has over 20 years of experience in the biopharmaceutical industry. Prior to joining Bellicum, Fair served as a senior executive at Genentech, Inc., a biotechnology company, and Johnson & Johnson, a public pharmaceutical and medical device company. Fair is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Fair knowingly, recklessly, or with gross negligence made improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2017 and 2018, Bellicum paid Fair as follows:

| YEAR | SALARY | OPTION AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | OTHER COMPENSATION | TOTAL COMPENSATION |
|------|--------|---------------|---------------------------------------|--------------------|--------------------|
| 2017 | $494,532 | $3,839,408 | $534,732 | $13,791 | $4,882,462 |
| 2018 | $551,050 | $2,429,201 | $280,347 | $17,527 | $3,278,125 |

22.     Defendant Thomas J. Farrell ("Farrell") was the Bellicum's CEO from February 2006 until January 2017, a member of its Board from April 2007 until January 2017, and President from November 2011 until January 2017. He became an advisor for the Company in January 2017. Farrell is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Farrell knowingly, recklessly, or with gross negligence made improper statements in Bellicum's press releases, public filings,

and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2015, 2016, and 2017, Bellicum paid Farrell as follows:

| YEAR | SALARY | STOCK AWARDS | OPTION AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|---|---|
| 2015 | $474,583 | --- | $2,822,688 | $189,834 | $2,198 | $3,489,303 |
| 2016 | $510,100 | --- | $1,967,942 | $177,891 | $2,196 | $2,649,129 |
| 2017 | $45,822 | $373,293 | $433,247 | --- | $865,968 | $1,718,330 |

Additionally, while the price of Bellicum stock was artificially inflated and defendant Farrell was in possession of material, adverse nonpublic information, he sold 7,500 shares of personally held Bellicum stock at artificially inflated prices for proceeds of $128,993.

23.     Defendant Alan A. Musso ("Musso") was Bellicum's Chief Financial Officer ("CFO") and Treasurer from November 2014 until August 2018. At the time he left the Company, Musso had 30 years of experience in the biotech and pharmaceutical industry. Musso is named as a defendant in the related Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Musso knowingly, recklessly, or with gross negligence made improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2015, 2016, 2017, and 2018, Bellicum paid Musso as follows:

| YEAR | SALARY | STOCK AWARDS | OPTION AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|---|---|
| 2015 | $347,500 | --- | $1,058,508 | $97,300 | $32,186 | $1,535,494 |
| 2016 | $368,000 | --- | $737,978 | $91,448 | $29,520 | $1,226,946 |
| 2017 | $385,000 | $104,175 | $360,046 | $78,829 | $47,919 | $975,969 |
| 2018 | $290,127 | $115,375 | $402,469 | --- | $264,885 | $1,072,856 |

Additionally, while the price of Bellicum stock was artificially inflated and defendant Musso was in possession of material, adverse nonpublic information, he sold 88,234 shares of personally held Bellicum stock at artificially inflated prices for proceeds of $1.52 million, including 23,323 shares for proceeds of $221,050 sold during November and December 2017.

24.     Defendant Annemarie Moseley ("Moseley") was Chief Operating Officer and Executive Vice President of Clinical Development at the Company from November 2012 until July 2017. In July 2017, she resigned and became a consultant until departing in January 2019. At the time she left the Company, Moseley had over 20 years of industry experience in translational medicine and clinical development of stem cell therapies, immunotherapies, biological devices, and combination products. Moseley previously held CEO positions at Osiris and Cognate Therapeutics, and prior management positions at Guidant, Novartis, and Rhone-Polenc Rorer. Moseley is named as a defendant in the related Securities Class Action that alleges she violated sections 10(b) and 20(a) of the Exchange Act. Defendant Moseley knowingly, recklessly, or with gross negligence made improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2015, 2016, and 2017, Bellicum paid Moseley as follows:

| YEAR | SALARY | STOCK AWARDS | OPTION AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|---|---|
| 2015 | $410,000 | --- | $1,840,990 | $131,200 | $13,232 | $2,395,422 |
| 2016 | $422,300 | --- | $1,537,455 | $119,934 | $7,772 | $2,087,461 |
| 2017 | $275,917 | $138,900 | $480,061 | --- | $798,606 | $1,693,484 |

Additionally, while the price of Bellicum stock was artificially inflated and defendant Moseley was in possession of material, adverse nonpublic information, she sold 120,000 shares of personally held Bellicum stock at artificially inflated prices for proceeds of $2.16 million.

9

25.     Defendants Fair, Farrell, Musso, and Moseley are collectively referred to herein as the "Officer Defendants" or the "Securities Class Action Defendants."

26.     Defendant James F. Brown ("Brown") has served as a member of the Board since November 2011 and as Chairman of the Board since December 2014. Brown has also been a member of the Board's Audit and Compensation Committees since at least 2014. Brown serves on other boards of directors for various IT and biotechnology companies. Defendant Brown knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2015, 2016, and 2017, Bellicum paid Brown as follows:

| YEAR | DIRECTOR FEES | OPTION AWARDS | TOTAL COMPENSATION |
|---|---|---|---|
| 2015 | $79,750 | $150,367 | $230,117 |
| 2016 | $80,375 | $78,527 | $158,902 |
| 2017 | $81,000 | $66,787 | $147,787 |
| 2018 | $81,000 | $64,509 | $145,509 |

27.     James M. Daly ("Daly") has served as a member of the Board since May 2016. Daly currently serves on the boards of directors of three other biopharmaceutical companies. Daly previously served as an executive of Incyte Corporation, a public biotechnology company; Amgen, Inc., a public biopharmaceutical company; and GlaxoSmithKline, a public pharmaceutical company. Defendant Daly knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2016, 2017, and 2018, Bellicum paid Daly as follows:

10

| YEAR | DIRECTOR FEES | OPTION AWARDS | OTHER COMPENSATION | TOTAL COMPENSATION |
|------|---------------|---------------|--------------------|--------------------|
| 2016 | $17,500 | $78,527 | $898 | $96,925 |
| 2017 | $37,625 | $66,787 | $2,093 | $106,505 |
| 2018 | $38,500 | $64,509 | $724 | $103,733 |

28.     Stephen R. Davis ("Davis") has served as a member of the Board since July 2015.
Davis has been the Chairperson of the Board's Audit Committee since July 2015. Since March
2015, Davis has served as President and CEO of ACADIA Pharmaceuticals, Inc., a public
biotechnology company. Prior to that, Davis served as ACADIA's Executive Vice President, CFO,
and Chief Business Officer. Davis served as a member of the board of directors of Heron
Therapeutics, Inc., a public biotechnology company, where he also served as Executive Vice
President and Chief Operating Officer. Davis also served as Executive Vice President and COO
of Ardea Biosciences, Inc., a public biotechnology company, and as a director of Synageva
BioPharma Corp. Defendant Davis knowingly, recklessly, or with gross negligence made (or
allowed to be made) improper statements in Bellicum's press releases, public filings, and other
public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols
and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials.
In 2015, 2016, 2017, and 2018, Bellicum paid Davis as follows:

| YEAR | DIRECTOR FEES | OPTION AWARDS | OTHER COMPENSATION | TOTAL COMPENSATION |
|------|---------------|---------------|--------------------|--------------------|
| 2015 | $25,000 | $385,944 | $1,963 | $412,907 |
| 2016 | $54,375 | $78,527 | $5,396 | $138,298 |
| 2017 | $55,000 | $66,787 | $7,185 | $128,972 |
| 2018 | $55,000 | $64,509 | $4,960 | $124,459 |

29.     Reid M. Huber ("Huber") has served as a member of the Board since October 2014.
Huber has been a member of the Board's Compensation Committee since at least 2014 and
Chairperson of the Science Committee since December 2015. Huber currently serves as the
Executive Vice President and Chief Scientific Officer of Incyte Corporation, a public

biotechnology company. Defendant Huber knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2015, 2016, 2017, and 2018, Bellicum paid Huber as follows:

| YEAR | DIRECTOR FEES | OPTION AWARDS | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|
| 2015 | $47,500 | $150,367 | $5,866 | $203,733 |
| 2016 | $56,250 | $78,527 | $3,271 | $138,048 |
| 2017 | $59,500 | $66,787 | $2,384 | $128,671 |
| 2018 | $57,500 | $64,509 | $3,655 | $125,644 |

30.     Jon P. Stonehouse ("Stonehouse") has served as a member of the Board since December 2014. Stonehouse has been a member of the Board's Audit Committee and Chairperson of the Compensation Committee since at least 2014. Stonehouse serves as the CEO and a member of the Board of Directors of BioCryst Pharmaceuticals, Inc., a public biopharmaceutical company. Previously, Stonehouse served in various positions at Merck KGaA, a pharmaceutical company. Defendant Stonehouse knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2015, 2016, 2017, and 2018, Bellicum paid Stonehouse as follows:

| YEAR | DIRECTOR FEES | OPTION AWARDS | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|
| 2015 | $52,500 | $150,367 | $3,016 | $205,883 |
| 2016 | $61,250 | $78,527 | $3,060 | $142,837 |
| 2017 | $62,500 | $66,787 | $3,436 | $132,723 |
| 2018 | $62,500 | $64,509 | $1,784 | $128,793 |

31.     Defendant Frank B. McGuyer ("McGuyer") was a member of the Board between March 2009 and December 2018. He was a member of the Board's Compensation Committee since at least 2014 through 2018, and a member of the Audit Committee from January 2015 through July 2015. He is the founder of and chairman of the Board of Directors and CEO of McGuyer Homebuilders Inc., a private homebuilding company. Defendant McGuyer knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2015, 2016, 2017, and 2018, Bellicum paid McGuyer as follows:

| YEAR | DIRECTOR FEES | OPTION AWARDS | TOTAL COMPENSATION |
|------|---------------|---------------|--------------------|
| 2015 | $46,250 | $150,367 | $196,617 |
| 2016 | $43,875 | $78,527 | $122,402 |
| 2017 | $43,500 | $66,787 | $110,287 |
| 2018 | $37,125 | $64,509 | $101,634 |

32.     Defendant Kevin M. Slawin ("Slawin") was a member of the Board from July 2004 to June 2017; Chief Technology Officer from February 2006 to December 2016; Executive Chairman from February 2006 to April 2014; Chief Medical Officer from February 2006 to March 2015; President from September 2004 to November 2011; and Chairman of the Board, CEO and Secretary from September 2004 to February 2006. Defendant Slawin cofounded Bellicum in 2004. Slawin was a member of the Board's Science Committee from December 2015 until June 2017. Defendant Slawin knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the

13

accompanying regulatory risk, and the safety of the product candidate in its clinical trials. In 2017, Bellicum paid Slawin as a director as follows:

| YEAR | DIRECTOR FEES | OPTION AWARDS | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|
| 2017 | $20,000 | --- | $316,347 | $336,347 |

Beginning in 2015, the Board approved a consulting agreement by which Slawin was paid $25,000 per month (plus reimbursement of his healthcare benefit premiums) to serve as a special advisor to the Science Committee. The consulting agreement ran through March 30, 2018. Additionally, while the price of Bellicum stock was artificially inflated and defendant Slawin was in possession of material, adverse nonpublic information, he sold 280,000 shares of personally held Bellicum stock at artificially inflated prices for proceeds of $4.51 million.

33.     Defendants Fair, Brown, Daly, Davis, Huber, Stonehouse, McGuyer, and Slawin are collectively referred to herein as the "Director Defendants." Defendants Brown, Davis, Stonehouse, and McGuyer are collectively referred to herein as the "Audit Committee Defendants." Defendants Huber and Slawin are collectively referred to herein as the "Science Committee Defendants." Defendants Farrell, Musso, Moseley, and Slawin are referred to herein as the "Insider Selling Defendants." All of the foregoing individuals are sometimes collectively referred to herein as the "Individual Defendants."

## IV.     DEFENDANTS' DUTIES

### A.     The Individual Defendants' Fiduciary Duties

34.     By reason of their positions as present or past officers and/or directors of Bellicum and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.

Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing, and not to act in furtherance of their personal interest or benefit.

35.     Because of their positions of control and authority as directors and/or officers of Bellicum, the Individual Defendants were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Bellicum, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business, operations, and prospects so that the market price of the Company's stock would be based on truthful and accurate information.

36.     To discharge their duties, the Individual Defendants were, and are, required to exercise reasonable and prudent oversight and supervision over the management, policies, practices, and controls of Bellicum. By virtue of such duties, the Individual Defendants were, and are, required to, among other things:

      a.      exercise good faith to ensure that the Company was operated in a diligent, efficient, honest, and prudent manner and in accordance with all applicable laws (including federal and state laws, government rules and regulations, and the Company's Certificate of Incorporation and Bylaws);

      b.      neither violate nor knowingly permit any officer, director, or employee of Bellicum to violate any applicable laws, rules, or regulations;

      c.      remain informed as to the status of Bellicum's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto, and to take steps to correct such conditions or practices;

d.    establish and maintain systematic and accurate records and reports of the business and affairs of Bellicum and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.    maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Bellicum are conducted in accordance with all applicable laws, rules, and regulations; and

f.    truthfully and accurately guide investors and analysts with respect to the business operations of the Company.

## B.    Additional Duties Pursuant to the Company's Code of Conduct

37.    The Individual Defendants were also bound by the Company's Code of Business Conduct and Ethics (the "Code"), which applies to "every employee, officer and director." Among other things, the Code states that: "It is the policy of the Company to promote high standards of integrity by conducting our affairs in an honest and ethical manner."

38.    With respect to the Individual Defendants' responsibilities for legal compliance, it states:

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility.

39.    With respect to the Individual Defendants' responsibilities for regulatory compliance, it states:

The Company's business is subject to, or may in the future be subject to, a number of legal and regulatory requirements, including standards related to ethical procedures and proper scientific conduct. We expect employees to comply with all such requirements.

40.    With respect to the Individual Defendants' responsibilities concerning public reporting (including filings with the SEC), it states:

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as governmental agencies. In particular, we rely

16

upon our accounting and other business and corporate records in preparing periodic and current reports that we file with the Securities and Exchange Commission ("SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

41.     With respect to the Individual Defendants' responsibility to refrain from trading the

Company's stock on the basis of confidential information, it states:

### 3. INSIDER TRADING

Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when handling material inside information.

### C.     Additional Fiduciary Duties of the Audit Committee Defendants

42.     In addition to the fiduciary duties discussed above, the Audit Committee Defendants owed specific duties to Bellicum under the Audit Committee's Charter (the "Audit Charter"). According to the Audit Charter, the Audit Committee was responsible for assisting the Board in overseeing: (i) the Company's corporate accounting and financial reporting processes; (ii) the systems of internal control over financial reporting; (iii) audits of financial statements; (iv) the quality and integrity of the Company's financial statements and reports; and (v) the Company's legal, regulatory, and ethical compliance programs.

43.     The Audit Charter charges the Audit Committee Defendants with the following functions and processes, among others:

> **10.  *Management's Discussion and Analysis.*** To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports or Registration Statements to be filed with the Securities and Exchange Commission.

> **11. *Press Releases.*** To review and discuss with management and the Auditors, as appropriate, earnings press releases, and press releases containing information relating to material financial developments and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions with respect to the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of such discussions.

> \*          \*          \*

> **13. *Risk Assessment and Management.*** To review and discuss with management and the Auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures; and to review and discuss with management insurance programs, including director and officer insurance, product liability insurance and general liability insurance (but excluding compensation and benefits related insurance).

> \*          \*          \*

**18.** *Internal Control Over Financial Reporting.* To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of internal control over financial reporting including significant deficiencies or material weaknesses identified by the Company's Auditors. To review with management and the Auditors any fraud, whether or not material, that includes management or other employees who have any significant role in the Company's internal control over financial reporting and any significant changes in internal controls or other factors that could significantly affect internal controls, including any corrective actions in regard to significant deficiencies or material weaknesses.

\*     \*     \*

**23.** *Ethical Compliance; Compliance with Legal and Regulatory Requirements.* To review reports from management and the Auditors regarding the adequacy and effectiveness of the Company's procedures to monitor and ensure compliance with its legal and regulatory responsibilities, including the Company's disclosure controls and procedures, as well as its Code, and regarding legal matters and compliance with legal and regulatory requirements that may have a material effect on the Company's business, financial statements or compliance policies, including any material reports or inquiries from regulatory or governmental agencies.

**24.** *Regulatory and Accounting Initiatives.* To review with counsel, the Auditors, and/or management, as appropriate, any significant regulatory or other legal or accounting initiatives or matters that may have a material impact on the Company's financial statements, or compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

\*     \*     \*

**33.** *General Authority.* To perform such other functions and to have such powers as may be necessary or appropriate in the efficient and lawful discharge of the foregoing.

**D.    Additional Fiduciary Duties of the Science Committee Defendants**

44.     According to the Company's SEC Form DEF 14A Proxy Statement dated April 26,

2017, the Board's Science Committee has the following responsibilities and duties:

The Science Committee acts on behalf of the Board to, among other things, advise management from time to time upon request and make recommendations to the Board with respect to our research and development programs, technology and objectives.

Additionally, the Science Committee "has authority to engage legal counsel or other experts or

consultants, as it deems appropriate to carry out its responsibilities."

### E.     Control, Access, and Authority

45.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Bellicum, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Bellicum.

46.     Because of their advisory, executive, managerial, and directorial positions with Bellicum, each of the Individual Defendants had access to adverse, nonpublic information about the operations and improper representations of Bellicum.

47.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Bellicum and was at all times acting within the course and scope of such agency.

### F.     Reasonable and Prudent Supervision

48.     To discharge their duties, the officers and directors of Bellicum were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Bellicum were required to, among other things:

> a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful, accurate, and complete statements to the investing public;
>
> b.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest-quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> c.     properly and accurately guide stockholders and analysts as to the true business practices, operations, and financial prospects of the Company at any given time, including making accurate statements about the Company's business practices, operations, and financial prospects, as well as its internal controls;

d.   remain informed as to how Bellicum conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices, and make such disclosures as necessary to comply with securities laws; and

e.   ensure that Bellicum was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.   BREACHES OF DUTIES

49.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Bellicum, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

50.   The Individual Defendants breached their duty of loyalty and good faith by allowing each other to cause, or by themselves causing, the Company to make improper statements in its press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. The Individual Defendants further breached their fiduciary duties by failing to timely remedy, or otherwise cause to be addressed, these deficient clinical trial practices, procedures, and protocols. They also failed to cause the timely disclosure of three cases of encephalopathy which were deemed possibly related to BPX-501. These unlawful practices wasted the Company's assets and caused Bellicum to incur substantial damage.

51.   The Audit Committee members had a duty to properly oversee Bellicum's public statements, risk assessment and management, and internal control functions. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements

21

detailed herein, and failing to properly oversee Bellicum's public statements, risk assessment and management, and internal control functions.

52.    The Science Committee members had a duty to properly oversee Bellicum's research and development programs, technology, and objectives. The Science Committee Defendants breached their duty of loyalty and good faith by allowing the Company's clinical program to suffered from severe flaws in monitoring and managing adverse events that could ultimately lead the FDA or other regulators to delay or altogether prevent completion of clinical testing or the approval of BPX-501.

53.    The Insider Selling Defendants further breached their duty of loyalty by selling Bellicum stock on the basis of material, adverse nonpublic information before that information was revealed to the Company's stockholders.

54.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Bellicum, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions. In addition, as a result of defendants' improper course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of federal securities laws. As a result, Bellicum has expended, and will continue to expend, significant sums of money.

## VI.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

55.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

56.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Bellicum, regarding the Company's future prospects and the Individual Defendants' management of Bellicum's operations; (ii) facilitate the Insider Selling Defendants' illicit sale of their personally held shares while in possession of material, adverse nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Bellicum and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

57.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper public statements.

58.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment and insider selling and to conceal adverse information concerning the Company's operations and future prospects.

59.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VII.    SUBSTANTIVE ALLEGATIONS

### A.    Company Background

61.     Bellicum is a clinical-stage biopharmaceutical company headquartered in Houston, Texas. According to the Company, it has "a limited operating history" and is "not profitable, ha[s] no products approved for commercial sale and ha[s] incurred significant losses since [its] inception in 2004." For this reason, Bellicum must finance its operations primarily through the issuance of additional debt and equity, and through grants.

62.     The Company is focused on discovering and developing cellular immunotherapies for various forms of cancer, including hematological cancers and solid tumors, as well as orphan inherited blood disorders. The Company uses its chemical induction of dimerization ("CID") technology platform to engineer and then control components of the immune system. It is attempting to develop next-generation product candidates in the areas of cellular immunotherapy, including HSCT, chimeric antigen receptors ("CAR") T-cells therapy and T-cell receptor ("TCR") cell therapies. The Company's product candidates include BPX-501, BPX-601, and BPX-701, while its CID-based technologies include CaspaCIDe and GoCAR-T.

63.     The Company's technology, CaspaCIDe, is its "safety switch," incorporated into its HSCT and TCR product candidates. CaspaCIDe is designed to eliminate cells in the event of toxicity. The CaspaCIDe switch consists of the CID-binding domain coupled to the signaling domain of iCaspase, an enzyme that is part of the apoptotic, cell death pathway. Infusion of

rimiducid is designed to trigger activation of the domain of iCaspase, which in turn leads to selective apoptosis of the CaspaCIDe-containing cells.

64.     The Company's lead product candidate, BPX-501 (also known as rivogenlecleucel or Rivo-cel), is an adjunct T-cell therapy administered after allogeneic HSCT using genetically modified donor T-cells incorporating its CaspaCIDe safety switch.

65.     Allogeneic HSCT involves the transferring of healthy blood-forming stem cells from a healthy genetically similar donor to the patient. When a transplant is successful, the donor stem cells can replace stem cells in the bone marrow, potentially providing a long-term cure of the patient's disease. The donated cells produce white blood cells that attack any remaining cancer cells in the patient's body.

66.     The challenge for about 70% of patients facing a transplant has always been finding the perfect match. For these patients, physicians may consider a haploidentical transplant, *i.e.*, from a half-matched donor (typically a sibling, parent, child, or first degree relative). While haploidentical donors are much easier to identify, the possibility of morbidity and mortality associated with GvHD and infections are a significant concern. Therefore, haploidentical HSCT transplants are often performed only after all other options are exhausted. Mitigation of the risk of GvHD typically involved either *in vivo* or *ex vivo* depletion of T-cells from the Graft, which may then lead to infections or other serious challenges like non-engraftment, slow immune reconstitution, and relapse.

67.     Bellicum's BPX-501 product is designed to address physicians' reluctance to perform these risky transplants. The product contains Bellicum's "safety switch" which allows important T-cells to be added back to speed immune reconstitution and control infections. Alpha beta T-cells are removed from the Graft and in a separate collection of donor T-cells the molecular

safety switch is introduced. The BPX-501 product is then typically infused into the patient within 7-14 days after the transplant. Should severe GvHD occur, the administration of rimiducid will activate the safety switch to ablate the gene-modified donor T-cells and quickly resolve the GvHD. Thus, BPX-501 is designed to improve the chances of transplant success, accelerate the recovery of the depleted immune system, and decrease infection and relapse rates.

68.     The following graphic illustrates how BPX-501 is administered:



69.     BPX-501, in combination with rimiducid, is granted orphan drug designation by the FDA for the treatment of immunodeficiency and GvHD following allogeneic HSCT.

70.     As with any new product candidate, in order to obtain approval to market and sell BPX-501 in the United States, Bellicum must follow FDA rules and regulations regarding clinical testing to prove its safety and efficacy. This includes human clinical trials that, according to Bellicum's Form 10-K filings, typically proceed in three phases:

> *Phase 1*. The biological product is initially introduced into healthy human subjects and tested for safety. In the case of some products for severe or life-threatening diseases, especially when the product may be too inherently toxic to ethically

administer to healthy volunteers, the initial human testing is often conducted in patients.

*Phase 2.* The biological product is evaluated in a limited patient population to identify possible adverse effects and safety risks, to preliminarily evaluate the efficacy of the product for specific targeted diseases and to determine dosage tolerance, optimal dosage and dosing schedule.

*Phase 3.* Clinical trials are undertaken to further evaluate dosage, clinical efficacy, potency, and safety in an expanded patient population at geographically dispersed clinical trial sites. These clinical trials are intended to establish the overall risk to benefit ratio of the product and provide an adequate basis for product labeling.

Post-approval clinical trials, sometimes referred to as Phase 4 clinical trials, may be conducted after initial marketing approval. These clinical trials are used to gain additional experience from the treatment of patients in the intended therapeutic indication, particularly for long-term safety follow-up.

71.     According to FDA regulations, the FDA must be notified no later than 15 days after learning of a "serious adverse drug experience," which includes any reaction that is fatal, life threatening, or requires in-patient hospitalization or prolongs hospitalization. If it is an "unexpected" reaction, the FDA must be notified by telephone, facsimile transmission, or in writing, within 7 calendar days of the receipt of that information. A complete written report must follow within 8 calendar days. The FDA considers all clinical trials results and nonclinical studies in determining whether to approve a product candidate for market.

**B.     Bellicum's BPX-501 Clinical Trials**

72.     In 2014, Bellicum initiated BP-004, a Phase 1/2 clinical trial conducted in both European and U.S. pediatric transplant centers, in children with leukemia, lymphoma, or orphan inherited blood disorders, such as severe combined immunodeficiency, Wiskott-Aldrich Syndrome, and beta thalassemia, each of which is a fatal or chronic life-long disorder for which HSCT is curative.

73.     Unbeknownst to investors, the clinical trial practices, procedures, and protocols that the Company had in place to monitor, manage, and report adverse events suffered egregious

deficiencies. Making matters worse, Bellicum did not have appropriate clinical trial practices, procedures, and protocols in place for comprehensive monitoring and management of neurologic adverse events, which are known risks in patients undergoing allogeneic HSCT. The foregoing deficiencies raised a strong risk that regulators (including the FDA) would force Bellicum to cease conducting any BPX-501 studies until the deficiencies were resolved.

74.     While conducting the clinical trials with these deficient procedures in place, three pediatric patients treated with BPX-501 in the BP-004 trial suffered a severe adverse event known as encephalopathy. Encephalopathy is a general term referring to brain disease, damage, or malfunction. Each case of encephalopathy occurred in a different treatment center. One of the patients died as a result.

75.     According to the Amended Complaint in the Securities Class Action, a confidential witness (referred to as CW1), who worked at Bellicum's headquarters, heard about a patient death due to encephalopathy in the U.K. BP-004 BPX-501 clinical trial from a colleague in manufacturing. The witness said that the death was common knowledge and openly discussed at the Company. CW1 also reported that after the Company significantly slowed down production of BPX-501 in mid-2017, he/she was told that the patient death likely influenced the slowdown.

76.     The Company later confirmed to analysts that the adverse event which led to a patient death occurred months prior to year-end 2017, while the other two adverse events had occurred even earlier.

77.     At no point prior to January 30, 2018 was it publicly disclosed that Bellicum had suffered these significant and troubling adverse events in its clinical trials for BPX-501.

78.     Given the significance to investors of adverse events such as these in Bellicum's clinical studies, the Company would often publicly describe the relevant circumstances. For example, during Bellicum's Q2 2016 earnings call on August 8, 2016, defendant Farrell stated:

> As reported initially at EBMT, a fourth patient with leukemia developed severe chronic GvHD with activation of largely of the allograft T-cells. While administration of rimiducid resulted in reduction of the BPX-501 T-cells and a partial resolution of the liver symptoms, rimiducid of course, does not eliminate allograft T-cells and the chronic GvHD was subsequently fatal. Since no BPX-501 cells were detectable in the patient at the time of GvHD progression, this event is not considered BPX-501 or rimiducid related.

Inexplicably, while this GvHD death was promptly disclosed, the three instances of encephalopathy were not.

79.     Given the known encephalopathy risks, it is perplexing that the Individual Defendants allowed Bellicum's failure to maintain appropriate clinical trial practices and procedures to continue for so long. According to a February 2, 2018 article posted on BioParma-Reporter.com entitled "Patient deaths trigger clinical hold in US, Bellicum awaits instruction," the regulatory risks of such a failure were clear. The article provided two earlier examples of T-cell therapy candidates undergoing increased scrutiny from regulators. It stated in part:

> **T-cell troubles**
>
> T-cell therapy candidates have attracted increased attention from regulators following deaths in clinical trials.
>
> In July, 2016 the FDA ordered Juno Therapeutics halt its ROCKET trial for JCAR015 – indicated to treat patients suffering relapsed or refractory B cell acute lymphoblastic leukemia – following three patient deaths.
>
> Unlike BPX-501, Juno's candidate uses patients' own T-cells that have been genetically modified to express a chimeric antigen receptor (CAR), and bind to leukemia cells.
>
> In November that same year, Juno announced two more deaths in the ROCKET trial due to swelling of the brain.

In September last year, the FDA placed Cellectis SA's trials for cell therapy UCART123 on clinical hold following the death of a patient, who suffered from Cytokine Release Syndrome (CRS), a lung infection, and Capillary Leak Syndrome.

80.     These earlier clinical holds were publicly disclosed by Juno Therapeutics, Inc. and Cellectis SA at the time and were reported in the media.

81.     In fact, during Bellicum's Q2 2016 earnings call on August 8, 2016, an analyst specially mentioned the extra scrutiny that the Company's T-cell peers had received from the FDA and asked defendant Farrell whether Bellicum had seen such scrutiny with respect to BPX-501.

82.     The Individual Defendants' conduct was even more egregious given that BPX-501 was far and away the Company's lead clinical product candidate and the only one with the potential for generating significant revenue for the Company in the near term. The following graphic from the Company's 2017 Form 10-K illustrates Bellicum's product pipeline at that time:



83.     In 2017, after one or more of the adverse encephalopathy events had occurred, Bellicum hired Dr. Paul Woodard as the Vice President of clinical development responsible for managing the clinical trials with trial design, strategy, and medical oversight. The choice to hire Woodard at this time is telling. In 2004, Woodard co-authored a scientific paper discussing HSCT

wherein he describes the encephalopathy risks associated with HSCT and the serious danger to patients when it occurs.

84.     Also, in mid-2017, defendant Moseley resigned as COO and Executive Vice President of Clinical Development after having a leading role in clinical development, including co-authoring numerous scientific posters and reports used prominently in Bellicum presentations.

### C.     The Individual Defendants Made, or Allowed to be Made, Improper Public Statements Regarding BPX-501

85.     On January 13, 2015, Bellicum issued a press release entitled "Bellicum Pharmaceuticals Announces Successful Dosing of First Patient Cohort With BPX-501 T Cells Following Haplo-Identical Hematopoietic Stem Cell Transplant," which contained a quote attributed to defendant Farrell stating: "We're pleased to have successfully launched a clinical program *acceptable to U.S. and European regulatory agencies* that allows us to include patients with blood cancers and up to 18 different non-malignant blood diseases under a single protocol." (Emphasis added).

86.     The foregoing statement was false and misleading when made because it failed to disclose or otherwise acknowledge the material problems with and deficiencies in Bellicum's BPX-501 clinical trial practices, procedures, and protocols, including the sub-standard protocol for monitoring and managing adverse events, which later led the FDA to place a hold on the BPX-501 clinical trials. The Company also failed to disclose that the unacceptable BPX-501 clinical program raised a serious risk to the timing and ultimate approvability of BPX-501, and with no approved products generating revenue, to the Company's near-term and long-term financial viability.

87.     On March 20, 2015, Bellicum filed its 2014 Form 10-K with the SEC which included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed

by defendants Farrell and Musso. The SOX Certifications claimed that the 2014 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The 2014 Form 10-K included the following statements:

> We are currently conducting three Phase 1/2 clinical trials of BPX-501 at leading transplant centers in the United States and Europe: BP-001, a clinical trial in adults in which BPX-501 is administered after initial allogeneic HSCT for hematological cancers, BP-003, a clinical trial in children with orphan inherited blood disorders in which BPX-501 is administered after initial allogeneic HSCT, and BP-004 an additional Phase 1/2 clinical trial in children with hematological cancers or orphan inherited blood disorders. In addition, we are planning to initiate additional Phase 1/2 clinical trials in the United States and Europe in 2015, as part of our strategy to pursue a global regulatory approval and expand the potential addressable patient population for BPX-501.
>
>        \*       \*       \*
>
> In all cases, ***the clinical trials are conducted in accordance with GCP and the applicable regulatory requirements and the ethical principles*** that have their origin in the Declaration of Helsinki.
>
>        \*       \*       \*
>
> [W]e are responsible for ensuring that each of our studies is conducted in accordance with applicable protocol, legal, regulatory and scientific standards, and our reliance on third parties does not relieve us of our regulatory responsibilities. ***We and these third parties are required to comply with current good clinical practices, or cGCPs, which are regulations and guidelines enforced by the FDA and comparable foreign regulatory authorities for product candidates in clinical development.***

(Emphasis added).

88.     The foregoing statements in the 2014 Form 10-K, and the SOX certifications, were false and misleading when made because in opting to speak about Bellicum's pursuit of regulatory approval for BPX-501 by means of clinical trials and representing the trials as following good clinical practices, they failed to explain that the Company's clinical program suffered severe flaws

in monitoring and managing adverse events that could ultimately lead the FDA or other regulators to delay or altogether prevent completion of clinical testing or the approval of BPX-501.

89. On March 14, 2016, Bellicum filed its 2015 Form 10-K with the SEC which included SOX Certifications signed by defendants Farrell and Musso. The 2015 Form 10-K repeated the misstatements contained in the 2014 Form 10-K and were false and misleading for the same reasons described above in ¶ 87.

90. On March 14, 2016, Bellicum held its 4Q 2015 earnings call, in which defendant Farrell said

> We believe our cell therapies have disruptive potential with the unique safety and efficacy benefits. As you know, we recently met with the National Institutes of Health Recombinant DNA Advisory Committee which reviewed product candidates involving gene transfer about the BPX-501 and BPX-601 protocols. We believe the meetings went well and are moving forward with our plan to file INDs with the FDA for these product candidates.
>
> *          *          *
>
> We look forward to meeting with regulators in Europe and the U.S. in the second quarter with the goal of defining the path to regulatory filing and approval initially in non-malignant pediatric genetic diseases.

91. On April 5, 2016, Bellicum issued a press release entitled "Bellicum Pharmaceuticals Announces BPX-501 Clinical Data Updates," which said:

> "In both malignant and nonmalignant patients, the results show that treatment with BPX-501 appears safe, well-tolerated, and provides important immune benefits," commented Tom Farrell, President and CEO of Bellicum Pharmaceuticals. "These data also demonstrate high BPX-501 cell viability, expansion and persistence, and that the improvement of immune reconstitution is sustained. We look forward to sharing more results as these data mature, and providing updates following our plan to meet with the U.S. FDA and EMA during the second quarter of this year."

92. On May 9, 2016, Bellicum issued a press release entitled "Bellicum Pharmaceuticals Reports First Quarter 2016 Financial Results" which included a statement that

the Company was "[p]reparing to meet with the European Medicines Agency and U.S. FDA, with

the goal of defining the path to regulatory filing and approval."

93.     On August 8, 2016, Bellicum held its 2Q 2016 earnings call in which defendant

Farrell stated:

> We're pleased with the progress we have made toward defining an expedient
> pathway to the potential approval of BPX-501 and rimiducid for pediatric transplant
> patients in Europe. We're now initiating discussions with the FDA and expect to
> be able to provide additional guidance on the approval pathways in both markets
> during the fourth quarter.

94.     The statements made on the March 14, 2016 earnings call, in the April 5, 2016 press

release, in the May 9, 2016 press release, and on the August 8, 2016 earnings call were false and

misleading when made because, in opting to speak about Bellicum's pursuit of regulatory approval

for BPX-501 by means of clinical trials, defendants Farrell, Moseley, and Musso failed to explain

that the Company's clinical program suffered severe flaws in monitoring and managing adverse

events that could ultimately lead the FDA or other regulators to delay or altogether prevent

completion of clinical testing or the approval of BPX-501.

95.     Later on the August 8, 2016 Q2 2016 earnings call, an analyst posed the follow

question to defendant Farrell:

> Hey, Thomas, it's Peter Lawson. Just a follow-up just around what's been
> happening with some of your peers on the T cell side of things. Have you seen any
> extra scrutiny or extra inbound questions from the FDA or the AMA around the T
> cell programs, at least for 501?

Farrell replied:

> No. Our most recent interactions have been around BPX-601 and 701. I think our
> observation would be that they are being careful in their review, they appear to be
> applying some sort of consistent thinking, two novel constructs coming through
> their office, but I don't think we've seen anything that we could say was explicitly
> tied to specific recent circumstances.

96.     Farrell's statement was false and misleading when made because he knew or was reckless in not knowing that other T-cell therapy candidates had already attracted increased attention from the FDA following deaths in clinical trials. For example, a death had resulted in a clinical hold in 2016 on trials being conduct by Juno Therapeutics. Additionally, in opting to speak about potential issues with regulatory approval for BPX-501 by means of clinical trials, defendant Farrell failed to explain that the Company's clinical program suffered severe flaws in monitoring and managing adverse events, including neurologic adverse events, that could ultimately lead the FDA or other regulators to delay or altogether prevent completion of clinical testing or the approval of BPX-501.

97.     On November 9, 2016, Bellicum filed its Q3 2016 Form 10-Q with the SEC, stating in relevant part:

> Discussions are ongoing with European Medicines Agency (EMA) and the FDA in regards to approval requirements for BPX-501 and rimiducid. Details regarding specific study endpoints and the data analysis plan are being refined in a formal protocol assistance process with EMA. The Company has also initiated dialogue with the FDA to define a U.S. regulatory pathway. We expect to have guidance from EMA by year end, and anticipate that the FDA regulatory interactions will continue into 2017.

98.     On December 5, 2016, Bellicum issued a press release titled "Bellicum Presents Clinical Results to Date of BPX-501 Pediatric Program and Provides Regulatory Update at Investor Event During ASH Annual Meeting," in which defendant Farrell stated:

> We're also pleased with the progress we've made in formalizing an expedient pathway to regulatory approval in Europe with BPX-501 to treat both malignant and nonmalignant diseases. We look forward to providing an update on our U.S. regulatory path in the first half of 2017.

99.     The Company's statements from November 9 and December 5, 2016, were false and misleading when made because in opting to speak about Bellicum's pursuit of regulatory approval for BPX-501 by means of clinical trials, they failed to explain that the Company's clinical

program suffered severe flaws in monitoring and managing adverse events that could ultimately lead the FDA or other regulators to delay or altogether prevent completion of clinical testing or the approval of BPX-501.

100.    On March 13, 2017, Bellicum filed its 2016 Form 10-K with the SEC which included SOX Certifications signed by defendants Fair and Musso. The 2016 Form 10-K repeated the misstatements contained in the 2014 Form 10-K and the 2015 Form 10-K and was false and misleading for the same reasons described above in ¶ 87.

101.    The 2016 Form 10-K further stated:

We have discussions ongoing with the FDA regarding the regulatory path to approval in the U.S. and we expect to provide updates in the first half of 2017.

*        *        *

In addition, we are planning to initiate additional Phase 1/2 clinical trials in the U.S. and Europe, as part of our strategy to pursue global regulatory approvals and expand the potential addressable patient population for BPX-501.

102.    On March 13, 2017, Bellicum issued a press release titled "Bellicum Pharmaceuticals Provides Operational Update and Reports Financial Results for the Fourth Quarter and Year Ended December 31, 2016," which stated in part: "The Company advanced discussions with the U.S. FDA on BPX-501's path for product registration in the U.S." It also quotes defendant Fair: "On the regulatory front, we clarified our path to approval with BPX-501 and rimiducid in Europe, and made substantial progress in dialogue with the FDA on the design of U.S. registration trials."

103.    On March 13, 2017, Bellicum held its 4Q 2016 earnings call in which defendant Fair commented with respect to BPX-501:

[O]ur team and our collaborators have made significant clinical and regulatory progress over the past year on BPX-501.

*        *        *

In the U.S., we're pleased to report that we've made substantial progress in our ongoing discussions with the FDA on the design of U.S. registration trials. We expect to conduct two separate trials in pediatric patients receiving haplo transplants, including a non-randomized trial in patients with orphan inherited blood disorders and a controlled study in patients with blood cancers.

We expect to finalize discussions with the FDA on both protocols in the second quarter of this year and begin enrollment for these trials during the second half.

Defendant Mosley added:

In terms of the FDA, while we are certainly in discussions with them on a strategy similar to that in Europe again, it's just a bit premature to talk about the final design and we'll be coming back to you with that.

\*       \*       \*

Currently as you can imagine the [European] data are very valuable from a planning perspective and from a safety perspective. Again, in our discussions today, we're really seeing interest from FDA in these two planned trials and we'll have a little bit more data on that probably by midyear.

104.    The March 13, 2017 statements by the Company, Fair, and Moseley regarding clinical and regulatory progress were false and misleading when made because in opting to speak about Bellicum's pursuit of regulatory approval for BPX-501 by means of clinical trials, they failed to explain that the Company's clinical program suffered severe flaws in monitoring and managing adverse events that could ultimately lead the FDA or other regulators to delay or altogether prevent completion of clinical testing or the approval of BPX-501.

105.    On May 8, 2017, Bellicum issued a press release titled "Bellicum Pharmaceuticals Reports First Quarter 2017 Financial Results," in which defendant Fair stated: "We continued to make progress on the registration trial for BPX-501, and presented updated clinical data highlighting its potential to transform patients' lives." It also contained this statement from the Company:

At the Bone Marrow Transplant (BMT) Tandem Meeting in February, Bellicum reported data from the BP-004 trial which showed a low incidence of transplant-related mortality, rapid immune recovery, a low rate of GvHD that was manageable

with standard treatments or rimiducid, ***and no serious adverse events associated with the use of BPX-501 or rimiducid***.

(Emphasis Added).

106.    The May 8, 2017 statements by Fair and the Company were false and misleading when made because in opting to speak about Bellicum's pursuit of regulatory approval for BPX-501 by means of clinical trials, they failed to explain that the Company's clinical program suffered severe flaws in monitoring and managing adverse events that could ultimately lead the FDA or other regulators to delay or altogether prevent completion of clinical testing or the approval of BPX-501.

107.    On August 8, 2017, Bellicum filed its Q2 2017 Form 10-Q with the SEC, stating in relevant part: "We are finalizing plans for future U.S. clinical trials of BPX-501. We plan to pursue one or more clinical trials with the intent of filing for FDA approval." The filing spoke about neurotoxicity issues with CAR-T cell therapies but there was no disclosure of BPX-501 related neurotoxicity issues, despite widespread knowledge throughout the Company of the cases of encephalopathy plausibly related to BPX-501:

> While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have arisen in patients treated with CAR T cell therapies. These toxicities include instances in which the CAR T cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome," or CRS, neurologic toxicities and cases in which they have attacked healthy organs. In each case, these toxicities have sometimes resulted in death. In solid tumors, where the behavior of CAR T cells is particularly unpredictable and results have been inconsistent, enhanced CAR T cell approaches are being developed that raise even greater safety concerns.

108.    On August 8, 2017, Bellicum held its 2Q 2017 earnings call in which defendant Fair stated:

> And so, we've recast our plan in the U.S. to focus on a single ultra-orphan disease where the unmet need is the greatest, where the regulatory path is clear and straightforward, so that we can get an FDA approval. And we believe with the FDA approval, combined with the data set that we've generated across the U.S. and

European programs, that U.S. treating physicians will have the information they need. So, it's a much more streamlined and efficient program, so that we can offer access to pediatric patients . . . .

\*          \*          \*

[W]e have a supportive regulator in the U.S. who buys into the benefit risk profile and is also cognizant of the issues that we will face in manufacturing and long-term safety follow-up that we were all vigilant about. But we think they've offered a very realistic path to market for cell therapy and I think that's positive news for the whole community including us.

\*          \*          \*

We don't have any pushback on the program that we have previously been devising in pediatrics in the U.S. from the FDA. We, as I indicated it, underwent a thorough strategic review of our entire portfolio, but particularly on BPX-501, recently concluded that and made the decision based on strategic priorities. As I mentioned, we felt like it wasn't the best use of our resources to do a large basket like trial in pediatrics in the U.S. that essentially replicated the BP-004 trial and the comparative MUD trial, which is the type of program that would have been required to get a comparable label. We see the largest opportunity in adult malignant setting and want to prioritize our resources there and on our future pipeline. But what we did see is the opportunity to provide access in the U.S. by a streamlined program to get an FDA approval and to leverage the totality of the data that we will have . . . .

109.    On August 8, 2017, Bellicum issued a press release titled "Bellicum Pharmaceuticals Reports Second Quarter 2017 Financial Results and Provides Corporate Update," in which defendant Fair states: "We continue to be encouraged by the results from our ongoing BPX-501 pediatric studies and our progress toward a filing in Europe. We have adjusted our plans for U.S. registrational trials to enable an efficient path to seeking approvals for the greatest areas of unmet need."

110.    The August 8, 2017 statements by Fair and the Company were false and misleading when made because in opting to speak about Bellicum's pursuit of regulatory approval for BPX-501 by means of clinical trials and the risk of neurotoxicity issues, they failed to explain that the Company's clinical program suffered severe flaws in monitoring and managing adverse events that could ultimately lead the FDA or other regulators to delay or altogether prevent completion

39

of clinical testing or the approval of BPX-501. Additionally, by this time the defendants knew, or were reckless in not knowing, that one or more pediatric patients had suffered encephalopathy with plausible causation by BPX-501.

111.    In September 2017, Bellicum presented at the Ladenburg Thalmann 2017 Healthcare Conference. On November 15, 2017, Bellicum also presented at the Jefferies 2017 London Healthcare Conference. The following slide was used in the Jefferies conference presentation, with a slight alteration in same slide used in the prior Ladenburg conference presentation, but no material difference:



112.    In this slide on regulatory strategy for BPX-501, Bellicum is claiming they are "fast to market in pediatrics" and are on track for trials for adults, though the Individual Defendants knew the clinical program procedures regarding monitoring and managing of adverse events suffered severe flaws that could lead the FDA to place a hold on the clinical studies, particularly given the undisclosed case(s) of encephalopathy plausibly related to BPX-501 suffered during the trial.

113.    On November 7, 2017, Bellicum issued a press release titled "Bellicum Reports Third Quarter 2017 Financial Results." In the press release, Bellicum continued to make positive assertions about BPX-501 and the progress of its clinical studies. Defendant Fair was quoted as stating:

> "We made good progress advancing our pipeline in the third quarter. Enrollment in our clinical program for BPX-501 remains on track and we progressed our plans for future trials in adult AML and a pediatric orphan blood disorder," said Rick Fair, Bellicum's President & Chief Executive Officer. "On BPX-601, we modified our Phase 1 trial to accelerate evaluation of our first clinical GoCAR-T candidate, and we look forward to reporting preliminary results next year. Finally, we continued to advance several exciting preclinical programs, leveraging our dual-switch controllable cell therapy platform."

The press release continued:

**PROGRAM HIGHLIGHTS AND CURRENT UPDATES**

***BPX-501***

*Adjunct T-cell therapy incorporating the CaspaCIDe® safety switch, administered after a haploidentical hematopoietic stem cell transplant (haplo-HSCT), to improve outcomes and reduce mortality*

**Bellicum Continues to Advance its BPX-501 Program**

Enrollment in the EU BP-004 clinical trial remains on track to be complete by the end of 2017. Bellicum has also initiated C-004, an observational trial in pediatric patients receiving transplants from matched unrelated donors (MUD) without BPX-501. The outcomes of both trials could form the basis for filings of European Marketing Authorization Applications for BPX-501 and rimiducid. A BPX-501 abstract, highlighting data on immune reconstitution from the EU BP-004 clinical trial, has been accepted for an oral presentation at the upcoming 59th Annual Meeting of the American Society of Hematology (ASH) in December.

**Company Prepares for Additional BPX-501 Trials in U.S.**

Planning is ongoing for two additional trials of BPX-501 to expand the eligible patient population and support potential U.S. registration. These trials are being developed in adult patients with acute myeloid leukemia (AML) and in a distinct orphan inherited blood disorder patient population.

114.    The November 7, 2017 statements by Fair and the Company were false and misleading when made because in opting to speak about Bellicum's pursuit of regulatory approval

for BPX-501 by means of clinical trials, they failed to explain that the Company's clinical program suffered severe flaws in monitoring and managing adverse events that could ultimately lead the FDA or other regulators to delay or altogether prevent completion of clinical testing or the approval of BPX-501. Additionally, by this time the defendants knew, or were reckless in not knowing, that one or more pediatric patients had suffered encephalopathy with plausible causation by BPX-501.

115.    On November 7, 2017, Bellicum filed its Q3 2017 Form 10-Q with the SEC, stating in relevant part: "We are working on plans and assessing feasibility for future U.S. clinical trials of BPX-501. We expect to pursue one or more clinical trials with the intent of an eventual filing for regulatory approval in the U.S. . . . ." The filing spoke about neurotoxicity issues with CAR-T cell therapies but there was no disclosure of BPX-501 related neurotoxicity issues, despite widespread knowledge throughout the Company of the cases of encephalopathy plausibly related to BPX-501:

> While high objective response rates have been reported in some hematological malignancies, serious and sometimes fatal toxicities have arisen in patients treated with CAR T cell therapies. These toxicities include instances in which the CAR T cells have caused high levels of cytokines due to over-activation, referred to as "cytokine release syndrome," or CRS, neurologic toxicities and cases in which they have attacked healthy organs. In each case, these toxicities have sometimes resulted in death. In solid tumors, where the behavior of CAR T cells is particularly unpredictable and results have been inconsistent, enhanced CAR T cell approaches are being developed that raise even greater safety concerns.

116.    The November 7, 2017 statements by the Company were false and misleading when made because in opting to speak about the risk of neurotoxicity issues, it failed to explain that the Company's clinical program suffered severe flaws in monitoring and managing adverse events that could ultimately lead the FDA or other regulators to delay or altogether prevent completion of clinical testing or the approval of BPX-501. Additionally, by this time the defendants knew, or were reckless in not knowing, that one or more pediatric patients had suffered encephalopathy with plausible causation by BPX-501.

### D.     The Truth About BPX-501 Emerges

117.     On January 30, 2018, after the market had closed, Bellicum issued a press release entitled "Bellicum Pharmaceuticals Announces Clinical Hold on BPX-501 Clinical Trials in the United States," which revealed the FDA placed a hold on BPX-501 clinical trials. The press release stated:

> Bellicum Pharmaceuticals, Inc. (NASDAQ:BLCM), a leader in developing novel, controllable cellular immunotherapies for cancers and orphan inherited blood disorders, today announced that the Company has received notice from the U.S. Food and Drug Administration (FDA) that U.S. studies of BPX-501 have been placed on a clinical hold following three cases of encephalopathy deemed as possibly related to BPX-501.
>
> Bellicum is awaiting formal communications from the FDA to determine the requirements for resuming studies, and will be working closely with the FDA to address their questions. . . .
>
> Encephalopathy has been reported in the allogeneic stem cell transplant literature. Risk factors for encephalitis/encephalopathy after allogeneic stem cell transplants include prolonged immunodeficiency, selected medications, infections, and inflammatory processes such as graft versus host disease. Bellicum has treated more than 240 patients with BPX-501 cells on three allogeneic haploidentical stem cell transplantation protocols. These three cases are complex, with a number of potential confounding factors—including, in certain of the cases, prior failed transplants, prior history of immunodeficiency, concurrent infection, and administration of rimiducid in combination with other medications. Bellicum is working with FDA to evaluate the risk of encephalopathy in patients receiving BPX-501.

118.     On this news, Bellicum's stock price plummeted by $2.12 per share, more than 25%, to close at $6.08 per share on January 31, 2018.

119.     As Bellicum later explained in its March 13, 2018 Form 10-K, the Company could not conduct any clinical trials on BPX-501 during the duration of the hold. The FDA hold also raised a risk that foreign regulatory authorities would similarly impose clinical holds on ongoing trials of BPX-501, which Bellicum said "would significantly delay our development and could end our development of BPX-501."

120.    Bellicum issued a press release on February 23, 2018 titled "Bellicum Announces Update on Clinical Hold of U.S. BPX-501 Studies." It stated:

> Bellicum Pharmaceuticals, Inc. (NASDAQ:BLCM), a leader in developing novel, controllable cellular immunotherapies for cancers and orphan inherited blood disorders, today announced it has received notification from the U.S. Food and Drug Administration (FDA) outlining the criteria required for lifting the clinical hold on U.S. studies of BPX-501. To address the FDA requirements, the Company plans to implement revisions to the U.S. study protocols, including the addition of more comprehensive monitoring and management of neurotoxicity. In addition, the Company will revise the Investigator Brochure and Informed Consent Documents to inform healthcare providers, patients and caregivers of the changes. The Company expects to provide a full response to the FDA within a few weeks.

> The clinical hold does not affect the Company's BP-004 registration trial in Europe.

121.    Then, on the Q4 2017 earnings call held on March 13, 2018, defendant Fair provided a further update of the status of the FDA's hold and the Company's response. He stated:

> Before I cover our plans for BPX-501 in the U.S., just a quick update on the FDA clinical hold. We submitted a full response to the agency last week. This response included our proposed changes to protocols with guidelines for comprehensive monitoring and management of neurologic adverse events, which are known risks in patients undergoing allogeneic stem cell transplant. We are optimistic that the changes will satisfy conditions for removal of the hold and look forward to hearing from the agency in the coming weeks.

> *     *     *

> I think as we have previously communicated, the clinical hold, basically the terms of the clinical hold, the FDA really requested us to update our protocols to clarify for investigators monitoring and management of neurotoxicities or neurologic adverse events that occur in these patients. And so the teams -- we have three active BPX-501 protocols in the U.S. The team has updated those protocols. The team has updated our investigator brochure which discloses the potential risk of these types of adverse events. And it has updated our patient inform consents and has submitted all of that to FDA for their feedback. So we look forward to hearing back from them soon. We believe we have responded fully to everything that the FDA asked and so feel like we are optimistic that the hold will be lifted in short order but, of course, we need to wait to hear from the FDA.

122.    On April 11, 2018, Bellicum issued a press release titled "Bellicum Announces Clinical Hold Lifted on U.S. Studies of BPX-501." It stated:

> Bellicum Pharmaceuticals, Inc. (NASDAQ:BLCM), a leader in developing novel, controllable cellular immunotherapies for cancers and orphan inherited blood disorders, today announced that the U.S. Food and Drug Administration has lifted the clinical hold on studies of BPX-501 in the U.S. The decision follows consultation with the FDA and agreement on amendments to the study protocols including guidance on monitoring and management of neurologic adverse events. Bellicum will be working with U.S. clinical sites to resume patient recruitment based on the amended protocols. The FDA clinical hold did not affect the BP-004 registrational trial in Europe, which is fully enrolled.

### E.    Damages to Bellicum

123.    As a result of the foregoing wrongful conduct, Bellicum and the Individual Defendants made improper statements in the Company's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. They further failed to cause the timely disclosure of three cases of encephalopathy which were deemed possibly related to BPX-501. The Individual Defendants also breached their fiduciary duties by failing to timely remedy, or otherwise cause to be addressed, these deficient clinical trial practices, procedures, and protocols, thereby subjecting the Company and its lead product candidate to unnecessary regulatory risk. This misconduct has damaged Bellicum's credibility and caused the Company to lose more than $70 million in market capitalization.

124.    As a direct and proximate result of the Individual Defendants' conduct, Bellicum has expended, and will continue to expend, significant sums of money. Such expenditures include, without limitation: (i) costs incurred in investigating and defending Bellicum and the Securities Class Action Defendants in the Securities Class Action, plus potentially tens of millions of dollars in settlement or to satisfy an adverse judgment; (ii) costs incurred in raising additional capital after the belated disclosures of the Company's misrepresentations and omissions concerning its clinical

trials, including the associated marginal costs of raising capital in the Company's April 20, 2018 offering of 9,200,000 shares of common stock at $7.50 per share; (iii) costs of clinical development activities, including patient treatment costs and investigator costs, associated with the preparation for the re-start of enrollment of patients in the Company's U.S. BPX-501 trials following the release of the FDA clinical hold; and (iv) costs incurred from compensation and benefits paid to the Individual Defendants, who have breached their fiduciary duties to Bellicum, which compensation was based at least in part on Bellicum's artificially-inflated stock price.

125.    These actions have irreparably damaged Bellicum's corporate image and goodwill. For at least the foreseeable future, Bellicum will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public, such that Bellicum's ability to raise equity capital or debt on favorable terms in the future will continue to be impaired. The Company stands to continue to incur higher marginal costs of capital and debt because of the misconduct.

## VIII.   DERIVATIVE ALLEGATIONS

126.    Plaintiffs bring this action derivatively in their own right and for the benefit of Bellicum to redress injuries suffered, and to be suffered, by Bellicum as a direct result of the violations of the federal securities laws, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants, and insider selling by certain defendants.

127.    Bellicum is named as a Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128.    Plaintiffs are current stockholders of Bellicum and have continuously owned such shares since the time of the wrongdoing complained of herein. Plaintiffs will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

129.     Because the Individual Defendants face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its stockholders.

130.     The wrongful acts complained of herein subjected, and continue to subject, Bellicum to harm.

## IX.     DEMAND ON THE BOARD OF DIRECTORS IS EXCUSED AS FUTILE

131.     Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

132.     Bellicum's current Board of Directors consists of defendants Fair, Brown, Daly, Davis, Huber, Stonehouse and non-defendants Edmund P. Harrigan ("Harrigan") and Judith Klimovsky ("Klimovsky"). Plaintiffs have not made any demand on the present Board or the stockholders of Bellicum to institute this action because such a demand would be a futile and useless act.

### A.     Demand Is Excused as to Defendant Fair Because He Lacks Independence

133.     Bellicum has conceded in its SEC filings that defendant Fair is not an independent director. For example, the Company's Form DEF 14A Proxy Statement dated April 25, 2019 states that defendant Fair is not considered independent since he is an executive officer of the Company. Defendant Fair has been Bellicum's President and CEO since January 2017. This lack of independence renders defendant Fair incapable of impartially considering a demand to commence and vigorously prosecute this action.

134.     Defendant Fair is also not independent because his principal professional occupation is his employment with Bellicum, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. Fair's annual base salary for 2019 is $567,582. Bellicum previously paid defendant Fair the following compensation:

| YEAR | SALARY | OPTION AWARDS | NONEQUITY INCENTIVE PLAN COMPENSATION | OTHER COMPENSATION | TOTAL COMPENSATION |
|---|---|---|---|---|---|
| 2017 | $494,532 | $3,839,408 | $534,732 | $13,791 | $4,882,462 |
| 2018 | $551,050 | $2,429,201 | $280,347 | $17,527 | $3,278,125 |

135.    Accordingly, defendant Fair lacks independence from defendants Brown, Daly, Davis, Huber, and Stonehouse, and non-defendants Harrigan and Klimovsky, due to his interest in maintaining his executive position at Bellicum.

**B.    Demand Is Excused as to Defendants Daly, Davis, and Huber, and Non-Defendant Harrigan, Due to Their Overlapping Business Affiliations**

136.    Many of Bellicum's Board members have long-standing professional ties to one another. The Board's tangled web of close relationships amounts to a conflict of interest that has precluded, and will continue to preclude, it from taking necessary and proper steps to investigate and remedy the Individual Defendants' improper conduct.

137.    Defendants Daly, Davis, and Huber, and non-defendant Harrigan are incapable of impartially considering a demand to commence and vigorously prosecute this action due to their long-standing overlapping business relationships. Defendants Daly, Davis, Huber, and non-defendant Harrigan are very active in the biopharmaceutical industry, which has created many entangling relationships with other Board members. In particular:

(a)    Defendants Davis, Daly, and non-defendant Harrigan all serve on the seven-member board of directors of ACADIA Pharmaceuticals Inc. ("ACADIA"), a biopharmaceutical company focused on the development of innovative medicines to address medical needs in central nervous system disorders. Defendant Davis has been president, CEO, and a director of ACADIA since September 2015. Defendant Daly has been a director of ACADIA since January 2016, and Harrigan has been a director of ACADIA since November 2015.

(b)    Defendant Davis and non-defendant Harrigan were employed concurrently at Neurogen Corporation ("Neurogen"), a development company that was focused on new small molecule drugs to address psychiatric and neurological disorders. Defendant Davis was a director of Neurogen from September 2001 until December 2009 and the CEO of Neurogen from February 2008 until December 2009. Non-defendant Harrigan was

Neurogen's Executive Vice President and Chief Development Officer from May 2002 until March 2003.

(c)     Defendants Daly and Huber were employed concurrently at Incyte Corporation ("Incyte"), a biopharmaceutical research company focused on oncology product development. Defendant Daly was the Executive Vice President and Chief Commercial Officer of Incyte from October 2012 until June 2015. Defendant Huber is the Executive Vice President and Chief Scientific Officer of Incyte and has been since April 2014. Defendant Huber's employment at Incyte began in January 2002, when he was Associate Director, Applied Technology.

138.     Defendants Davis, Huber, and Daly, and non-defendant Harrigan received the following compensation from their employment at the aforementioned companies:

(a) Stephen R. Davis Total Compensation: $55,476,992

| Company | Salary | Bonus | Option Awards | Restricted Stock Awards | Non-Equity Incentive Plan Compensation | Other Compensation |
|---------|--------|-------|---------------|-------------------------|----------------------------------------|--------------------|
| ACADIA | $2,795,082 | $740,158 | $43,049,970 | $505,400 | $1,029,744 | $149,260 |
| Neurogen | $3,265,112 | $597,089 | $1,713,688 | $969,500 | $155,186 | $920,187 |

(b) Reid M. Huber Total Compensation: $19,408,075

| Company | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | Other Compensation |
|---------|--------|---------------|--------------|----------------------------------------|--------------------|
| Incyte | $2,196,656 | $9,745,681 | $6,121,978 | $1,194,648 | $149,112 |

(c) James M. Daly Total Compensation: $7,821,037

| Company | Salary | Fees | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | Other Compensation |
|---------|--------|------|---------------|--------------|----------------------------------------|--------------------|
| ACADIA | --- | $199,750 | $1,452,208 | --- | --- | $1,979 |
| Incyte | $1,104,526 | --- | $3,597,446 | $320,039 | $884,765 | $260,324 |

(d) Edmund P. Harrigan Total Compensation: $2,595,946

| Company | Salary | Fees | Bonus | Option Awards | Restricted Stock Awards | Other Compensation |
|---------|--------|------|-------|---------------|-------------------------|--------------------|
| ACADIA | --- | $170,000 | --- | $1,585,352 | --- | $169,327 |
| Neurogen | $145,577 | --- | $19,500 | $17,500 | $480,000 | $8,690 |

139.    There is a reasonable doubt that defendants Davis, Daly, and Huber, and non-defendant Harrigan would vote to initiate litigation against each other due to these longstanding business relationships. As a result of these long-standing and extensive professional entanglements, defendants Davis, Daly, and Huber, and non-defendant Harrigan are incapable of impartially considering a demand to commence and vigorously prosecute this action. Demand is therefore futile as to defendants Davis, Daly, and Huber, and non-defendant Harrigan.

### C.    Demand Is Excused Because Defendants Brown, Daly, Davis, Fair, Huber, and Stonehouse Face a Substantial Likelihood of Personal Liability

140.    As alleged herein, six out of eight members of the current Board, that is, defendants Brown, Daly, Davis, Fair, Huber, and Stonehouse, breached their fiduciary duties of loyalty by making (or allowing to be made) improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. They further failed to cause the timely disclosure of three cases of encephalopathy which were deemed possibly related to BPX-501. These defendants also breached their fiduciary duties by failing to timely remedy, or otherwise cause to be addressed, these deficient clinical trial practices, procedures, and protocols, thereby subjecting the Company and its lead product candidate to unnecessary regulatory risk.

141.    Defendants Brown, Davis, and Stonehouse, as members of the Audit Committee, reviewed and approved the improper statements. The Audit Committee's Charter provides that the Audit Committee is responsible for reviewing and discussing with management earnings press releases, and other press releases containing material financial developments. The Audit Committee's Charter further tasks the Audit Committee members with the obligation to review the Company's major financial risk exposures. Thus, the Audit Committee Defendants were

responsible for knowingly or recklessly allowing the improper statements detailed herein. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Brown, Davis, and Stonehouse face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

142. Any suit by the current directors of Bellicum to remedy these wrongs would also expose defendant Fair (and defendants Farrell, Musso, Moseley and Nominal Defendant Bellicum) to liability for violations of the federal securities laws in the pending Securities Class Action, and would result in civil actions being filed against one or more of the other Individual Defendants. The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act. If the Board elects for the Company to press forward with its right of action against defendant Fair and others in this action, then Bellicum's efforts would compromise its defense of the Securities Class Action.

143. The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations. Defendants Brown, Daly, Davis, Fair, Huber, and Stonehouse face a substantial likelihood of liability for repeatedly failing to comply with this duty.

### D. Demand Is Excused as to Brown, Fair, Huber, Stonehouse, and non-defendant Harrington for Additional Reasons

144. Defendants Brown, Huber, Stonehouse, and non-defendant Harrington serve together on the Compensation Committee. These four individuals set at least portions of their compensation, as well as the compensation of their colleagues, Fair, Daly, Davis and non-

defendant Klimovsky. Their capacity to dole out compensation for themselves and their colleagues makes it impossible for each of them, and any of them, to independently and disinterestedly consider a shareholder demand to investigate or prosecute an action pertaining to the illegal conduct complained of herein.

145.    Defendant Huber is the Chairperson of the Science Committee. The Science Committee is charged with advising management and making recommendations with respect to Bellicum's research and development programs, including the programs relating to development of BPX-501, the Company's lead product candidate. In doing so, the Science Committee has the authority and duty to engage any experts or consultants necessary to carry out these critical responsibilities. Defendant Huber breached his fiduciary duties by failing to timely remedy, or otherwise cause to be addressed, the Company's deficient BPX-501 clinical trial practices, procedures, and protocols, thereby subjecting the Company and its lead product candidate to unnecessary and costly regulatory risk. Thus, defendant Huber faces a substantial likelihood of liability for his breach of fiduciary duties, making any demand upon him futile.

## X.    DEMAND ON SHAREHOLDERS IS UNNECESSARY

146.    Plaintiffs have not made any demand on the other stockholders of Bellicum to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Bellicum is a publicly held company with 46,009,066 shares outstanding as of April 30, 2019 , and with thousands of geographically-dispersed stockholders;

(b)    making demand on such a number of stockholders would be impossible for Plaintiffs who have no way of finding out the names, addresses, or phone numbers of Bellicum's stockholders; and

(c)    making demand on all stockholders would force Plaintiffs to incur excessive expenses, assuming all stockholders could be individually identified.

## XI.    CLAIMS FOR RELIEF

### COUNT I

### For Contribution for Violations of §10(b) and §21D of the Exchange Act
### (Against Defendants Farrell, Fair, Musso, and Moseley)

147.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

148.    Defendants Farrell, Fair, Musso, and Moseley are named defendants in the Securities Class Action.

149.    Bellicum is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, *inter alia*, violations of § 10(b) of the Exchange Act. If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of some or all of the defendants as alleged herein. The Company is entitled to receive contribution from those defendants in connection with the Securities Class Action against the Company.

150.    Defendants Farrell, Fair, Musso, and Moseley as directors and officers and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Bellicum, and had the power and/or ability, directly or indirectly, to control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and Rule 10b-5. Further, defendants Farrell, Fair, Musso, and Moseley are liable under § 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

151.    As a result, defendants Farrell, Fair, Musso, and Moseley damaged Bellicum and are liable to the Company for contribution.

152.     Plaintiffs, on behalf of Bellicum, have no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duties
### (Against the Individual Defendants)

153.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

154.     The Individual Defendants owed and owe Bellicum fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Bellicum the highest obligation of good faith, fair dealing, loyalty, and due care.

155.     Each of the Individual Defendants violated their fiduciary duties by consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

156.     The Officer Defendants were reckless or grossly negligent in disseminating the improper statements detailed herein. The Officer Defendants either knew, were reckless, or were grossly negligent in making improper statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. The Officer Defendants were also reckless or grossly negligent in failing to timely remedy, or otherwise cause to be addressed, these deficient clinical trial practices, procedures, and protocols. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

157.     The Director Defendants, as directors of the Company, owed Bellicum the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly disseminating or otherwise permitting the Company to disseminate the improper statements detailed herein. The Director Defendants either knew, were reckless, or were grossly negligent in making improper

statements in Bellicum's press releases, public filings, and other public statements relating to, *inter alia*, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, and the safety of the product candidate in its clinical trials. The Director Defendants were also reckless or grossly negligent in failing to timely remedy, or otherwise cause to be addressed, these deficient clinical trial practices, procedures, and protocols. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

158.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper misstatements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight and failed in their duty to appropriately review these public statements, as required by the Audit Committee Charter.

159.    The Science Committee Defendants breached their fiduciary duty of loyalty by recklessly, or with gross negligence, failing to timely remedy, or otherwise cause to be addressed, the Company's deficient clinical trial practices, procedures, and protocols.

160.    The Insider Selling Defendants breached their duty of loyalty by selling Bellicum stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was material, adverse nonpublic information concerning the Company's business prospects. It was an asset belonging to the Company, which defendants Farrell, Musso, Moseley, and Slawin used for their own benefit when they sold Bellicum common stock.

161.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Bellicum has sustained significant damages, as alleged herein. Accordingly, these defendants are liable to the Company.

162.    Plaintiffs, on behalf of Bellicum, have no adequate remedy at law.

## COUNT III

### Waste of Corporate Assets
### (Against the Individual Defendants)

163.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

164.    As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, Bellicum is subject to the Securities Class Action. The Individual Defendants have caused Bellicum to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

165.    As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

166.    Plaintiffs, on behalf of Bellicum, have no adequate remedy at law.

## COUNT IV

### Unjust Enrichment
### (Against the Individual Defendants)

167.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

168.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Bellicum. The Individual Defendants were

unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Bellicum.

169.    The Insider Selling Defendants sold Bellicum stock while in possession of material, adverse nonpublic information that artificially inflated the price of Bellicum stock.  As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

170.    Plaintiffs, as stockholders and representatives of Bellicum, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

171.    Plaintiffs, on behalf of Bellicum, have no adequate remedy at law.

## COUNT V

### Insider Selling
### (Against the Insider Selling Defendants)

172.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

173.    At the time the Insider Selling Defendants sold their Bellicum stock, they knew the information described herein and sold such stock on the basis of such information.

174.    The information described herein was material adverse, nonpublic information concerning the Company's business prospects.  It was an asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Bellicum stock.

175.    At the time of their stock sales, the Insider Selling Defendants knew the truth about the Company's business prospects, specifically related to, among other things, BPX-501's clinical trial practices, procedures, protocols and the accompanying regulatory risk, the safety of the

product candidate in its clinical trials, and the undisclosed adverse events associated with the clinical trials.

176.   The Insider Selling Defendants' stock sales while in possession and control of this material adverse, nonpublic information was a breach of their fiduciary duty of loyalty and good faith.

177.   Since the use of the Company's nonpublic information for their own gain constitutes a breach of fiduciary duty, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Selling Defendants retained thereby.

178.   By reason of the foregoing, Bellicum was damaged.

179.   Plaintiffs, on behalf of Bellicum, have no adequate remedy at law.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Finding that a stockholder demand on the Bellicum Board would have been a futile and useless act;

B.   Finding that the Individual Defendants have breached their fiduciary duties to the Company and violated the federal securities laws;

C.   Directing Bellicum to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Bellicum and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Company's clinical trial practices, procedures, and protocols, as well as strengthening its controls over reporting concerning the clinical trials of its product candidates;

- a proposal to strengthen the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and public;

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting controls;

- a proposal to declassify the Board;

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

- a proposal to require an independent Chairman of the Board;

- a provision to permit the stockholders of Bellicum to nominate three candidates for election to the Board;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test, and then strengthen, the Company's internal-operational control functions.

D.      Against each of the Individual Defendants in favor of Bellicum for the amount of damages sustained by Bellicum, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E.      Requiring the Individual Defendants to return to Bellicum all compensation and remuneration of whatever kind paid to them by Bellicum during the time that they were in breach of the fiduciary duties they owed to Bellicum;

F.      Requiring the Insider Selling Defendants to disgorge all profits realized through their sales of Bellicum stock at artificially inflated prices while in possession of material, adverse nonpublic information and requiring that such profits be held in constructive trust for the Company's benefit;

G.    Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Bellicum's directors, officers, and employees do not engage in wrongful or illegal practices;

H.    Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

I.    Awarding to Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

J.    Granting such other and further relief as this Court deems just and equitable.

## XIII.   DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

Dated: July 8, 2019

KENDALL LAW GROUP, PLLC

*/s/ Joe Kendall*

JOE KENDALL (Texas Bar No. 11260700)

3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
jkendall@kendalllawgroup.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA 30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

Attorneys for Plaintiffs Scott Ludovissy and
Ann Gordon Trammell